**UNITED STATES of America, Appellee,**

v.

**Joseph J. C. DiCARLO and Ronald C. MacKenzie, Defendants, Appellants.**

**No. 78–1026.**

United States Court of Appeals,
First Circuit.

Argued March 6, 1978.

Decided April 20, 1978.

Francis J. DiMento and Earle C. Cooley, Boston, Mass., with whom DiMento & Sullivan and Hale & Dorr, Boston, Mass., were on brief, for appellants.

Edward J. Lee, First Asst. U. S. Atty., Boston, Mass., with whom Edward F. Harrington, U. S. Atty., and Alan D. Rose, Asst. U. S. Atty., Boston, Mass., were on brief, for appellee.

Before COFFIN, Chief Judge, ALDRICH and CAMPBELL, Circuit Judges.

ALDRICH, Senior Circuit Judge.

This is an appeal from the denial of a new trial. Appellants, Joseph J. C. DiCarlo and Ronald C. MacKenzie, hereinafter defendants, were found guilty after a jury trial in the district court of conspiracy to violate, and of substantive violations of, the Hobbs and Travel Acts, 18 U.S.C. §§ 1951 and 1952. The offenses involved the extortion by defendants, then Massachusetts state senators, of $40,000 from McKee-Berger-Mansueto, Inc. (MBM), a New York based construction management firm, in connection with a report by a legislative committee chaired by DiCarlo concerning a state contract with MBM. While their principal appeal was pending, defendants moved the district court for a new trial, alleging, (1) constitutionally defective representation by defense counsel because of a conflict of interest, and because of incompetence; (2) a due process violation by the U. S. Attorney's failure, in response to a discovery request, to turn over certain letters allegedly having impeachment value in regard to a key government witness; (3) jury misconduct; and (4) newly discovered evidence, in the form of recantation of the testimony of certain witnesses. In connection therewith, defendants requested an evidentiary hearing.

In an extensive opinion, the district court denied defendants' motion. Almost coincidentally, we rejected the principal appeal. *United States v. DiCarlo,* 1 Cir., 1977, 565 F.2d 802. Being of the view that our decision was uncertworthy, First Circuit Rule 17, we denied bail pending petition therefor. Certiorari was thereafter denied, —— U.S. ——, 98 S.Ct. 1487, 55 L.Ed.2d 517 (1978). In addition, in an unpublished memorandum, we refused to stay the district court's refusal of bail pending the present appeal.

At the outset is the threshold issue of the proper standard of review for a case in this posture. The government, focusing upon the fact that the relief sought is a new trial, argues that the decision below may not be reversed absent proof that the trial court committed an abuse of discretion—the standard applied for motions for new trials under F.R.Crim.P. 33. *See United States v. Zannino,* 1 Cir., 1972, 468 F.2d 1299, 1303, cert. denied, 410 U.S. 954, 93 S.Ct. 1419, 35 L.Ed.2d 687. The district court, however, although defendants were not then in custody, treated their first three claims as falling under 28 U.S.C. § 2255, and only the last as of the discretionary scope of Rule 33. We agree.

In seeking collaterally to attack their convictions under section 2255, defendants bear the burden of establishing by a preponderance of the evidence that they are entitled to relief. *Coon v. United States,* 5 Cir., 1971, 441 F.2d 279, cert. denied, 404 U.S. 860, 92 S.Ct. 160, 30 L.Ed.2d 103. This includes the burden of showing that they are entitled, if they claim it, to an evidentiary hearing. Rule 4(b) of the Rules Governing Section 2255 Proceedings provides that the trial court may examine the record, the moving papers and any exhibits and affidavits submitted therewith and, on the basis of those materials, may summarily dismiss the motion if it "plainly appears . . . that the movant is not entitled to relief." *See Miller v. United States,* 1 Cir., 1977, 564 F.2d 103, 106; *Moran v. Hogan,* 1 Cir., 1974, 494 F.2d 1220. While genuine issues of material fact may not be resolved without a hearing, *see Blackledge v. Allison,* 1977, 431 U.S. 63, 80–81, 97 S.Ct. 1621, 52 L.Ed.2d 136, a hearing is not necessary "when a § 2255 motion (1) is inadequate on its face, or (2) although facially adequate, is conclusively refuted as to the alleged facts by the files and records of the case." *Moran v. Hogan,* ante, 494 F.2d at 1222. Moreover, if the claim is based upon facts with which the trial court, through review of the record or observation at trial, is familiar, the court may make findings without an additional hearing, and, as is the case for

findings of the trial court generally, those findings will not be overturned unless they are clearly erroneous. *Bartelt v. United States,* 5 Cir., 1974, 505 F.2d 647; *Zovluck v. United States,* 2 Cir., 1971, 448 F.2d 339, *cert. denied,* 405 U.S. 1043, 92 S.Ct. 1327, 31 L.Ed.2d 585.

### Ineffective assistance of counsel.

Defendants' attack upon trial counsel is in three layers. One is, broadly, that they were incompetent. This is a serious accusation to make against reputable and experienced attorneys. The court found it in no way borne out. We need not detail the court's reasons, nor consider the matter further, except to express surprise that, in light of their additional burden to overcome the district court's findings, they continue to press a charge that was baseless to begin with.

██ Secondly, it is claimed that in deciding not to elicit from certain witnesses the names of Senate President Kevin B. Harrington and former Governor Francis W. Sargent as recipients of questionable MBM payments, trial counsel were moved by concern for them rather than the interests of the defendants.[1] Finally, defendants say that if, in fact, their counsel considered solely defendants' best interests, there was, nonetheless, a constitutionally impermissible conflict of interest which required a new trial.

Taking first the issue whether trial counsel in fact gave weight to the interests of Harrington and Sargent, there is no direct testimony, nor could any reasonably be expected. Defendants must establish their claim by inference from the circumstances. The circumstances are these. About one year prior to the return of the indictments in this case, DiCarlo was informed by Harrington that DiCarlo was the object of federal criminal investigation. Harrington suggested that DiCarlo obtain the services of an attorney. He recommended Walter J. Hurley, an experienced criminal defense lawyer, at all times relevant to this case associated in the practice of law with Thomas M. Joyce. Joyce was a well known lobbyist, with many friends in Massachusetts political circles, including Harrington and then Governor Sargent. DiCarlo met with Joyce, who stated that he knew someone in the Justice Department who would keep him abreast of the progress of the investigation, and thus enable him to alert Hurley of any developments.

DiCarlo retained Hurley. Thereafter, learning from Hurley that MacKenzie was also under investigation, DiCarlo so informed MacKenzie. MacKenzie told DiCarlo that he intended to retain his present counsel, Earle C. Cooley, and DiCarlo reported this to Hurley. Hurley urged DiCarlo to persuade MacKenzie to retain, instead, Robert V. Mulkern, a lawyer unconnected with him, or Joyce, but who he believed would cooperate in a coordinated defense. MacKenzie acceded, but, at various times thereafter, expressed dissatisfaction. DiCarlo, at Hurley's prompting, reassured MacKenzie that Mulkern was properly handling the case. It is unclear from the record whether Hurley was a partner of Joyce, or simply an associate, but, in any event, Joyce said he would set the fee, and ultimately did so.[2] DiCarlo's checks to Hurley were endorsed for deposit to the account of Joyce's law firm.

On the sixth day of trial, the Assistant U. S. Attorney, Edward J. Lee, furnished Hurley and Mulkern with materials containing reports of FBI interviews with MBM president McKee, who was then on the stand, and MBM officer, Jack Thomas, who had yet to testify. These materials revealed, *inter alia,* statements of MBM officials that they had made payments to certain Massachusetts politicians, including $2,000 to Harrington and two $10,000 payments to one Albert Manzi, at least one alleged to be a

---

1. We agree with the trial court that of all the alleged shortcomings of trial counsel, the only one with any plausible relationship to the alleged conflict of interest is failure to use these names.

2. The record in no way supports some seeming suggestion in defendants' brief that Joyce said he would himself pay the fee.

political contribution to then Governor Sargent. On receipt of this material, defense counsel asked their clients whether the information should be used for the defense. DiCarlo's affidavit states that he told his counsel to use the information, "if it's helpful. Bring it out. Withhold nothing." The trial transcript reveals that both defense counsel used the general material extensively. During cross-examination of the MBM witnesses, who were crucial to the government's case, the issue of MBM's political contributions, nationwide, was probed in great detail, but the names of these recipients were not mentioned. Defendants now claim their counsel improperly refrained out of consideration for Harrington and Sargent.[3]

We agree with the court's finding that there were substantial risks involved in using these names which prudent counsel might very reasonably wish to avoid. The jury might have viewed the dragging of prominent figures into the case a desperate, but not exculpatory, tactic, particularly if they had responded and denied receipt. Conversely, if it should appear that these contributions were in fact made, and illegal—there is some suggestion that the second alleged payment to Manzi was the result of raw political blackmail—it is hard to see how this would have helped persuade a jury that MBM had not been subject to, and capitulated to, similar conduct by defendants.

In this posture defendants argue that, if, in fact, MBM had made these prior payments it would have had "friends in high places" enabling it to resist importunities by defendants. The suggestion that $2,000

purchased all-risk insurance, or that Harrington, for that amount, if requested, would have gone to DiCarlo and said, "You lay off," is not credible. Even less persuasive would be the thought that Sargent, the Republican governor, could have gone to the Democratic chairman purportedly investigating the propriety of a Republican-let contract, and said that MBM had paid enough already.

We accept the court's view that defendants have offered nothing to persuade it that defendants' counsels' decision was not a wise one. Nor is this overcome by defendants' claim that Hurley had a motive that conflicted with a decision to bring Harrington's and Sargent's names into the case —Joyce's friendship with these individuals. Concededly, Harrington and Sargent would have preferred not to be mentioned as recipients of possibly illegal payments,[4] but, aside from that publicity, they have not been shown to have any other interest inconsistent with those of the defendants. In fact, Harrington, at least, could be thought to have had a substantial interest in defendants' acquittal. One need not read the newspapers to conceive the pall cast upon the legislature as a whole by an extortion conviction of two prominent senators.

It is true that Joyce, as a lobbyist, wanted to cultivate friends with political power. Any concern for Sargent, however, would have been diminished by the fact that he was out of office by the time of trial. While he was friendly with Harrington, so he was with DiCarlo, who had already risen to a position of power. To put it crassly, we may wonder how it would improve his

---

3. Defendants also complain of their counsels' failure to accept the government's offer to locate one William Masiello and secure his presence at the trial, allegedly because he had been a former client of Mulkern. Quite apart from the fact that Masiello's purported testimony was supplied only by a hearsay affidavit, cf. 6 J. Moore, Federal Practice, ¶ 56.11[1.–2] at 200 (2d ed. 1976), the court found that he would have been a dangerous witness ("foolhardy") for defendants to call. We agree with the court that the failure to call Masiello in no way prejudiced the defendants. *See United States v. Donatelli,* 1 Cir., 1973, 484 F.2d 505.

4. In light of the present widespread concern over the MBM matter, of which we may take judicial notice, viewed by hindsight it would have been a considerable benefit to Harrington to have avoided the subject of the $2,000 check, provided that such silence would have ended the matter. However, this information was in the government's possession to begin with, and silence could not have been assured, regardless of whether defense attorneys pursued this line of inquiry.

stature as a lobbyist if he were to sell out one senator, who was his client, for an incidental benefit to another, who was not.

Defendants respond that the circumstances were such that they needed to prove no more than a possible conflict of interest, not an actual conflict. Concededly, there are such cases, but this was not one. In *Miller v. United States,* 1 Cir., 1977, 564 F.2d 103, we announced the standard by which claims of ineffective assistance of counsel based upon a conflict of interest are to be tested. There we distinguished between cases involving the joint representation of codefendants by one attorney, or members of the same firm, and cases of dual representation where an attorney presently has, or in the past has had, a legal relationship with a hostile party or witness. In the case of joint representation of codefendants we held that only a relatively slight showing of actual prejudice is required to establish ineffective assistance of counsel, because there an attorney "is particularly susceptible to disabling conflicts." *Id.* at 106; *Holloway v. Arkansas,* —— U.S. ——, ——, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978). However, where dual representation is involved, the danger of conflicts is not so great. Accordingly, a real conflict of interest or a specific instance of prejudice must be shown. *Id.* at 106; *see United States v. Jeffers,* 7 Cir., 1975, 520 F.2d 1256, *cert. denied,* 423 U.S. 1066, 96 S.Ct. 805, 46 L.Ed.2d 656; *United States v. Donatelli,* 1 Cir., 1973, 484 F.2d 505.

Defendants contend that their case presents similar dangers of conflict and thus should be governed by *Miller*'s joint representation standard. However, the special scrutiny given to instances where codefendants are represented by single counsel is not warranted here. First, obviously, there was no actual joint representation; each defendant had separate, unrelated counsel. Secondly, defendants do not claim that there ever was any attorney-client relationship between Joyce, Hurley or Mulkern and Harrington or Sargent. Finally, it is unsound to analogize the position of Harrington and Sargent to that of codefendants. Neither had been charged nor brought to trial. Disclosing their names to the jury as recipients of MBM's payments could not have increased their potential criminal liability, nor could any tactic by defendants' counsel have decreased that liability. Even if their names were not used, neither Harrington or Sargent, nor Joyce or Hurley could insure that the information, which the government already had, would not be revealed.

We, of course, do not suggest that an attorney may not have a pecuniary interest creating what we would term a per se disabling conflict. *See, e. g., United States v. Hurt,* 1976, 177 U.S.App.D.C. 15, 543 F.2d 162. When, however, the pecuniary interests are solely speculative—"the mere possibility of additional work for a former client,"—"the presumption [is] that the lawyer will subordinate his pecuniary interests and honor his primary professional responsibility to his clients in the matter at hand." *United States v. Jeffers, ante,* at 1265; *see, also, United States v. McCord,* 1974, 166 U.S.App.D.C. 1, 8–10, 509 F.2d 334, 351–53, *cert. denied,* 421 U.S. 930, 95 S.Ct. 1656, 44 L.Ed.2d 87.

Particularly is there a heavy burden on a defendant when the facts were known to him from the beginning, *United States v. James,* 5 Cir., 1975, 505 F.2d 898, *cert. denied,* 421 U.S. 1000, 95 S.Ct. 2397, 44 L.Ed.2d 667, or, as in this case, long before the trial ended instead of afterwards. Defendants selected Hurley precisely because Joyce had political connections. Such connections are not simplistic, but extend in many directions. The least defendants could expect was the possibility of some interface. The least that, in turn, could be expected of defendants would be to make their own decisions when some such matters surfaced. Defendants were in no respect naive or unsophisticated. Nothing was concealed from them, including the fact that day after day the trial was proceeding without their counsel disclosing the names to the jury. They do not excite our sympathy when, having lost their case, they ma-

lign their counsel, and say they were put upon. Defendants have failed to allege or establish a real conflict of interest or any actual prejudice. They are entitled to no relief. *Miller v. United States,* ante.

**Brady violation.**

Defendants next contend that the government's failure to disclose two letters written by Assistant U. S. Attorney Lee to prospective customers of MBM violated their right to a fair trial under *Brady v. Maryland,* 1963, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215. The letters were written prior to trial in response to inquiries by certain governmental agencies that were considering awarding contracts to MBM. After describing the indictment, MBM's role, and its cooperation with the government, the letters conclude that the U. S. Attorney was "not aware of any reason why [MBM] should be disqualified from public work." In their discovery request, defendants sought,

"23. All statements or promises or rewards of any kind, or tending in any way, directly or indirectly, to induce or encourage the giving of testimony, which statements have been made to any persons whom the Government intends to call as witnesses at the trial of the indictment herein.

"24. All evidence of any kind favorable to the defendants material either to guilt or punishment, including without limitation that which may tend to be exculpatory, to impeach or discredit incriminatory evidence or to mitigate the crime charged, or which may lead to evidence of such character."

Defendants maintain that the letters were recommendations of MBM by the government that would have been of value for impeaching MBM witnesses.

Since defendants posit their principal argument upon *United States v. McCrane,* 3 Cir., 1976, 547 F.2d 204, *re-affirming,* after remand, 427 U.S. 909, 96 S.Ct. 3197, 49 L.Ed.2d 1202, for further consideration in light of *United States v. Agurs,* 1976, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342, *United States v. McCrane,* 3 Cir., 1975, 527 F.2d 906, we start with an examination of that case. There the defendants requested,

"all material known to the government . . . which is exculpatory in nature or favorable to the defendant, or may lead to the discovery of exculpatory material or material which may be used to impeach prosecution witnesses . . ."

In response to a request by counsel for the principal prosecution witness, the U. S. Attorney wrote letters about the witness to parties proposing to enter into contractual relations with him, corresponding much, in general outline, to the case at bar. In the earlier case of *Brady v. Maryland,* ante, the prosecuting attorney, in response to a request, had failed to disclose a statement of a third party that could be regarded as exculpatory. The Court held,

"[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196.

The first *McCrane* court, after noting that impeaching evidence fell within *Brady,* stated that a promise of preferential treatment given to a witness by the government is admissible for impeachment purposes. It went on to say that "jurors might have felt that the mere act of writing the letters was preferential treatment." 527 F.2d at 911–12. It, accordingly, found a violation of *Brady* and ordered a new trial.

Although in *Brady* the Court made no point of it, the request called for all statements of a designated individual, and hence was, in fact, a "specific" request. In the initial *McCrane* opinion the court did not discuss the nature of the request. In *United States v. Agurs,* 1976, 427 U.S. 93, 96 S.Ct. 2392, 49 L.Ed.2d 342, however, the Court distinguished between general and specific requests. Refusal of a "specific and relevant" request "is seldom, if ever, excusable." 427 U.S. at 106, 96 S.Ct. 2392. This kind of request calls for any material evidence, *i. e.,* "evidence [that] might have

affected the outcome of the trial." *Id.* at 104, 96 S.Ct. at 2398.[5] On the other hand, the Court said that a general request, *e. g.*, "all Brady material," or "anything exculpatory," involves a very different standard.

"The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *Id.* at 112–13, 96 S.Ct. at 2401. [Footnotes omitted.]

Upon remand for reconsideration in the light of *Agurs,* the *McCrane* court concluded that its prior decision was correct under either alternative. If the defendant's request were to be construed as merely general, the evidence met *Agurs'* standard of materiality. But also, and it is for this that defendants seek to rely on it, the court regarded the request as specific, hence imposing the more liberal standard of materiality. In resolving this latter issue in favor of defendant the court relied on a statement in the government's brief which, although the government expressly denied that the request was specific, the court construed as a concession that it was. We

will not pursue the correctness of the court's construction; the government makes no such statement here.[6] However, unless the government had so conceded, we consider the *McCrane* request a classic example of a non-specific request as defined in *Agurs,* and decline to accept *McCrane's* contrary view. *See United States v. Hearst,* N.D.Cal., 1977, 435 F.Supp. 29, 30–31, *aff'd,* 9 Cir., 563 F.2d 1331, 1352.

We also reject *McCrane's* above-quoted statement that "the mere act of writing the letters was preferential treatment," unless read in conjunction with the evidence, elsewhere noted, that they were written at the request of the witness's counsel. This, however, brings us to the case at bar, where defendants claim that No. 23 was a specific request.

In construing No. 23 as not calling for the U. S. Attorney's letters the district court said,

"The subject letters were not 'recommendations,' were not communications to or requested by MBM and were neutral in their impact."

For present purposes we will assume the incorrectness of part of this statement; the letters were sufficiently recommendatory that we would consider them to be "rewards" if, but only if, a statement had been made to a MBM witness which put them in that light. There was no impeaching significance in the letters themselves. They were not relevant unless, as the final clause of the request specified, they were intended to influence the witness. Clearly, they could not influence the witness unless there had been a statement to him, either a promise that they would be written, or, at the least, subsequent communication enabling

---

**5.** For the benefit of the bar we do not read this phrase as corresponding with a later remark by the Court that "a jury's appraisal of a case 'might' be affected by an improper or trivial consideration as well as by evidence giving rise to a legitimate doubt on the issue of guilt." *Id.* at 108–9, 96 S.Ct. at 2400. Rather, we would apply the usual rule of demonstrably harmless error. *Chapman v. California,* 1967, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705. Nor, of course, must a request be answered just because it is specific. The initial question is whether it is *Brady* material.

**6.** We do, however, note the extraordinary claim in present defendants' brief that the concession by government counsel in this unrelated case in another circuit estops the government here. This would be extraordinary even if defendants could claim, which they make no pretense of doing, that they knew and relied on it, a necessary condition of estoppel.

him to realize that he had been rewarded. Not only is this clear, but the request itself, which appears carefully drawn, recognizes there would have had to have been a "statement" to the witness. The specificity of the request, in other words, related to any statement, not to the letters themselves.[7] There is nothing to overcome the U. S. Attorney's response that there was no such statement.

■ It may be conceded that the letters fell within the terms of a general request, of which No. 24 was a good example, seeking anything that might lead on to something else. Here, however, because of its generality, the government does not face the strict sanction which attends the refusal of a specific request. The district court properly applied the general test, and found that defendants failed.[8] We have considered the record, and find no reason to disagree.

*Misconduct by jurors.*

We may pass quickly over defendants' complaint, supported by the statements of two alternate jurors, that the jury was exposed to certain unspecified newspaper and television accounts of the trial, and that the jurors discussed the case among themselves. The district court held these assertions to be "insubstantial" and that the documents submitted revealed no "material derogation of the defendants' right to a fair trial," and thus neither an evidentiary hearing nor a new trial was warranted.

■ Defendants waived sequestration of the jury, thereby assuming the risk that the jurors would come in contact with some publicity concerning the trial. No relief is warranted without a showing that the publicity resulted in prejudice. *United States v. Perrotta,* 1 Cir., 1977, 553 F.2d 247; *United States v. D'Andrea,* 3 Cir., 1974, 495 F.2d 1170, *cert. denied,* 419 U.S. 855, 95 S.Ct. 101, 42 L.Ed.2d 88. Court and counsel carefully monitored the press coverage of the trial. On two occasions a potentially prejudicial article and television report were brought to the court's attention. Following the procedures required by *Perrotta,* the court polled the jurors as to whether they had seen them. In each case, all jurors responded that they had not.

■ Defendants now claim that similar inquiry should have been made as to other unspecified publicity allegedly seen or heard by the jurors. The court was correct in rejecting this claim. Absent specification of particular pieces of publicity, and a showing of their potentially prejudicial effect, it had no duty to inquire further.

■ The court also found insubstantial defendants' claim of pre-deliberation discussion of the case by the jurors, and consideration by the jurors of defendants' failure to testify. We agree. Quite apart from the fact that the alternate juror, who was the source of the statement that the jurors considered the defendants' failure to testify, was not present during the jury's deliberations following the court's charge, this claim flies in the face of the familiar principle that a verdict may not be impeached by a juror's testimony that the jury was guilty of misconceptions of fact or law, employed unsound reasoning, indulged in improper argument, etc. *See, e. g., Young v. United States,* 10 Cir., 1947, 163 F.2d 187, *cert. denied,* 332 U.S. 770, 68 S.Ct. 83, 92 L.Ed. 355; 6A J. Moore, Federal Practice, ¶ 59.-08[4] at 148–49 (2d ed. 1974). While there are exceptions, the present case is far from such.

*Newly discovered evidence.*

Defendants submitted three unsworn statements, two by witnesses at the trial,

---

**7.** Alternatively, if the request sought more, it failed to meet the basic requirement of a specific request, "notice of exactly what the defense desired." *Agurs,* 427 U.S. at 106, 96 S.Ct. at 2398.

**8.** "[The] letters would not in my view have created a reasonable doubt as to the guilt of the defendants, in the light of strong and persuasive evidence of guilt introduced at the trial. In the language of the Supreme Court the omission to furnish these letters was not material 'in the context of the entire record.' *United States v. Agurs, supra,* 112 [96 S.Ct. 2392]."

and one by the wife of one such witness, to support their claim, pursuant to F.R. Crim.P. 33, for a new trial on the ground of newly discovered evidence. The purported evidence takes the form of the recantation of two witnesses, Harding and Shields, concerning the July 6, 1972 meeting in New York City at which some of defendants' extortionate threats allegedly were made. The witnesses did not retract their testimony as to the fact of the meeting, but only suggested that they had been mistaken as to its date, which they now believe to have been sometime during the spring of 1972.

 So much was deficient with respect to these statements that we merely list the areas. Passing the fact that the court expressly disbelieved Shield's new version,[9] and impliedly did so as to Mr. and Mrs. Harding, whose statements, it found, were at least in part dictated by DiCarlo's new counsel, no explanation is offered for six months' delay, rather than eliciting this testimony at trial, or is offered to meet the "considerable skepticism," *Lemire v. McCarthy*, 1 Cir., 1978, 570 F.2d 17, 21, which attends recantation. The trial court's findings will not be disturbed. *United States v. Johnson*, 1946, 327 U.S. 106, 111–12, 66 S.Ct. 464, 90 L.Ed. 562.

We have considered the other arguments advanced by defendants and find them to be without merit. The order of the district court is affirmed.

---

**9.** As to Shield's testimony, the court noted, "Mr. Shield was an extremely articulate, assured and self-possessed witness. His manner was somewhat hostile to the United States Attorney. I cannot credit [defendants' claim] that untrue testimony was extracted from him against his will."