**Casey FISHER, Petitioner**

v.

**UNITED STATES of America, Respondent.**

**Civil Action No. 08–11186–RCL.**

United States District Court, D. Massachusetts.

July 30, 2009.

Peter K. Levitt, United States Attorney's Office, Boston, MA, for Respondent.

*MEMORANDUM AND ORDER*

YOUNG, District Judge.

## I. INTRODUCTION

Casey Fisher ("Fisher") petitions this Court to vacate his sentence and grant a new trial pursuant to 28 U.S.C. § 2255. (Pet'r Br., Doc. No. 117.[1]) Fisher is currently serving a 168–month sentence imposed by this Court after he pled guilty to one count of conspiracy to possess with intent to distribute marijuana in violation of 21 U.S.C. § 846 and was found guilty by a jury of one count of the use of interstate commerce facilities in the commission of a murder-for-hire, in violation of 18 U.S.C. § 1958(a), and one count of solicitation to commit a crime of violence, in violation of 18 U.S.C. § 373.

Fisher asserts two related claims of ineffective assistance of counsel. First, he claims that the advice he received from his attorney not to testify at trial was based on his attorney's objectively unreasonable and overly optimistic reading of the case law regarding the murder-for-hire statute. Had his attorney provided effective advice, he contends that he would have chosen to testify and that his testimony would have altered the result of the trial. Second, Fisher claims that but for that same erroneous advice about the murder-for-hire statute, he would have pled guilty, as opposed to proceeding to trial, and would potentially have received a lesser sentence. The United States has moved to dismiss the petition without a hearing, arguing that Fisher's claims are procedurally barred and, in the alternative, are completely unwarranted in law and fact.

## II. FACTS AND PROCEDURAL HISTORY

### A. Brousseau's Controlled Delivery of the Marijuana Shipment

On April 24, 2002, Alain Brousseau ("Brousseau"), a Canadian truck driver, was apprehended at a United States checkpoint in Champlain, New York. *United States v. Fisher*, 494 F.3d 5, 6 (1st Cir.2007). Brousseau attempted to cross the U.S. border from Canada with 166 kilograms of hydroponic marijuana, hidden in seven large duffel bags in the rear of his tractor trailer. *Id.* After his apprehension,

---

1. All docket numbers refer to the criminal docket in *United States v. Fisher*, 03–10244–RCL, the case under which Fisher was convicted of the three separate criminal counts. The Court ordered that all filings in Fisher's section 2255 petition be filed on the 03–10244–RCL docket, as opposed to the 08–11186–RCL docket.

Brousseau agreed to cooperate with law enforcement authorities by allowing them to monitor a controlled delivery of the marijuana to Route 79 Auto Sales ("Route 79" or "the garage") that same evening. *Id.* at 7; Day 2 Trial Tr. 34, 57, Doc. No. 89. Route 79 was an auto garage located in Lakeville, Massachusetts, and operated by Fisher. (Trial Day 2 Tr. 34.) Route 79 also served as a marijuana storehouse for George Otero ("Otero"), a close associate of Fisher and a major player in marijuana trafficking in the state of New Hampshire.[2] (*Id.* at 35–36, 84.)

When Brousseau arrived at the garage, Fisher and his brother, John Fisher ("John"), helped Brousseau unload the marijuana from the tractor into the garage. *Fisher,* 494 F.3d at 7. As Brousseau pulled his tractor away from the garage, authorities stopped the tractor and moved in to arrest Brousseau, John, and Fisher. *Id.;* Day 2 Trial Tr. 62. Brousseau was arrested by authorities; however, Fisher and John managed to escape away into the woods. *Fisher,* 494 F.3d at 7; Day 2 Trial Tr. 63.

### B. Fisher's Attempts to Hire Someone to Murder Brousseau

In October 2002, John was arrested and charged in the United States District Court for the Northern District of New York with conspiracy to possess marijuana with intent to distribute. *Fisher,* 494 F.3d at 7. On July 23, 2003, Fisher was indicted and charged, in a sealed indictment filed in this district, with one count of conspiracy to possess with intent to distribute marijuana, pursuant to 21 U.S.C. § 846. (Indictment, Doc. No. 1.) He was not, however, apprehended at the time.

On August 28, 2003, Fisher arranged a meeting with Otero at which the two discussed the case pending against John. *Fisher,* 494 F.3d at 7. Otero agreed to tape record the conversation, as part of his ongoing cooperation with the authorities in relation to his involvement with the drug bust at Route 79. During the conversation, Fisher explained to Otero his belief that Brousseau's testimony was the only piece of evidence the government had against his brother. *Id.* Additionally, Fisher informed Otero that he wanted to "get rid" of Brousseau so there would be no evidence against John. *Id.* Fisher also stated that he was going to ask "Ray–Ray," otherwise known as Raymond Aucoin ("Aucoin" or "Ray Ray")[3] to murder Brousseau.

Sometime before August 31, 2003, Fisher arranged by phone to meet with Aucoin in person. At that meeting, he asked Aucoin to murder Brousseau. *Id.* Fisher, however did not yet know Brousseau's identity or name; consequently, sometime between the date he met first met with Aucoin and August 31, 2003, Fisher made phone calls to a man named Norman Ouimette, who lived in Canada, to ask if he knew the identity of the truck driver. *Id.* Ouimette ultimately provided Fisher with Brousseau's name. Fisher then met with Aucoin on August 31 and gave Aucoin a small piece of lined paper with Brousseau's name handwritten on it. (Day 2 Trial Tr. 98.)

Pursuant to the information gained from the earlier recorded conversation between Fisher and Otero, investigators ordered surveillance of Aucoin. On September 5, 2003, Aucoin flagged down the local police

---

**2.** Otero also served as a cooperating witness in the case against Fisher. (Day 2 Trial Tr. 84.)

**3.** Aucoin was a close associate of Fisher with "an extensive criminal history," who engaged in illegal narcotics activities in the past and had participated in breaking and entering homes with Fisher. (Day 2 Trial Tr. 85.)

officer who was conducting surveillance and agreed to become a cooperating witness in the case against Fisher. *Id.* It was during this meeting that Aucoin informed authorities that Fisher had asked him to murder Brousseau. *Id.*

On September 8, 2003, Aucoin met with Special Agent Walter Houghton ("Houghton") for the first time. Agent Houghton, a customs and immigration agent, served as the case agent for the case against Fisher. (Day 2 Trial Tr. 55; Day 5 Trial Tr. 93, Doc. No. 92.) Aucoin informed Agent Houghton that Fisher had asked him to murder Brousseau. He also provided Agent Houghton with the piece of paper upon which Fisher had written Brousseau's name. *Fisher,* 494 F.3d at 7.

On September 10, 2003, at the direction of law enforcement, Aucoin met with Fisher and informed him that he would not murder Brousseau. *Id.* at 7. In order to arrange this meeting, Fisher called Aucoin at least once. At the meeting, Aucoin also told Fisher that he had found another hit man, Sgt. Michael Grassia ("Grassia") serving in an undercover capacity, who would kill Brousseau. Fisher and Aucoin discussed the price that Grassia would charge and whether it would be necessary to provide Grassia with any of the money before Brousseau's murder was confirmed. The two also discussed how Grassia would be able to access Brousseau in prison in Canada.

On September 19, 2003, after a series of phone calls between Aucoin and Fisher, at least one of which was initiated by Fisher, Aucoin, Fisher, and Grassia, met at the Lion's Club in Lakeville, Massachusetts. *Id.* During this meeting, Grassia and Fisher discussed the "hit" on Brousseau and Grassia demanded an initial $5,000 payment from Fisher, as a sign of good faith,

with the other $5,000 due upon completion of the job. *Id.* Fisher assured Grassia that he would be able to get the money and that the money would be available the following Friday. *Id.* On September 23, 2003, before Fisher engaged in any conduct consistent with accepting Grassia's offer, authorities arrested Fisher on a warrant for the indictment issued on July 23, 2003. *Id.*

## C. Fisher's Trial

On October 29, 2003, a superseding indictment was issued against Fisher, charging him with conspiracy to possess marijuana with intent to distribute marijuana, in violation of 21 U.S.C. § 846; use of interstate commerce facilities in the commission of murder-for-hire, in violation of 18 U.S.C. § 1958(a); and solicitation to commit a crime of violence, in violation of 18 U.S.C. § 373. (Superseding Indictment, Doc. No. 14.) On June 6, 2005, Fisher pled guilty to count one of the superseding indictment, conspiracy to possess with intent to distribute at least 100 kilograms of marijuana. *Fisher,* 494 F.3d at 8 n. 1.

On November 29, 2004, a six-day jury trial began on the two remaining counts. During trial, the government produced witnesses[4] who testified to previous drug transactions in which Fisher was involved, the controlled marijuana delivery made by Brousseau, Fisher's previous crimes, and the conversations and meetings between Fisher, Otero, Aucoin, and Grassia. (*See generally* Day 2—Day 5 Trial Trs.) Through witness testimony and tapes introduced at trial, the government sought to demonstrate that Fisher wanted Brousseau dead, made calls in furtherance of

---

4. Government witnesses included Special Agent Charles Callioras ("Callioras"), a special agent with Immigration and Customs Enforcement (ICE); Agent Houghton; Grassia; Aucoin; Brousseau; and Otero. (Day 2 Trial Tr. 55; Day 5 Trial Tr. 93.)

that goal, and knew it would come at a price of $10,000. (Day 5 Trial Tr. 37.)

Fisher's defense strategy, arrived at after consultation with his attorney, had at least two components. First, Fisher's attorney attempted to undermine testimony supporting an inference that Fisher ever had the necessary intent, while using a facility in interstate commerce, to commit the murder of Brousseau. Defense counsel sought to demonstrate that since Fisher never acted upon his agreement to produce $5,000 in order for Grassia to complete the job, he committed no crime. (*Id.*) Through the testing of witnesses' credibility, particularly Aucoin's, defense counsel sought to undermine juror confidence in their testimony and weaken the government's case against his client. (*Id.* at 60.) Defense counsel actively cross-examined witnesses and tested their credibility on the stand. (*See generally* Day 2—Day 5 Trial Trs.) In closing arguments, Fisher's counsel spent the majority of his time forcefully arguing that Fisher never possessed the requisite intent to be convicted under 18 U.S.C. § 1958.

Second, and more important for the purpose of the instant petition, Fisher's attorney pursued what Fisher has labeled, in his moving papers and his affidavit, as his "question of law" defense. More accurately defined as a "jurisdictional" defense, the substance of the theory, as recited by the First Circuit, was as follows:

> At the time of Fisher's indictment and conviction, 18 U.S.C. § 1958(a) defined as an element of the crime use of a facility *in* interstate or foreign commerce, while § 1958(b) defined a facility *of* interstate or foreign commerce as including means of communication. 18 U.S.C. § 1958 (2000). Fisher argue[d] that the use of the word "in" in § 1958(a) is significant. He urge[d] that while the language "use of a facility of

interstate commerce" encompasses intrastate usage of a telephone, the use of a facility in interstate commerce requires interstate or cross-border usage. Fisher thus argue[d] that the government was required to prove interstate or cross-border usage, and that it failed to do so.

*Fisher,* 494 F.3d at 10.

According to an affidavit submitted by Fisher's attorney, he was confident that this jurisdictional defense "would result in [Fisher's] acquittal of the charges after trial." (Cintolo Aff. ¶ 7, attach. to Pet'r Br.) Because of defense counsel's belief in the strength of this legal argument, "on several occasions," defense counsel "informed [Fisher] that he was innocent of the [murder-for-hire] count [in] his indictment, to wit 18 U.S.C.1958, in that an element of the offense was lacking. . . ." (*Id.* ¶ 6; *see also* Fisher Aff. ¶¶ 5–7, attach. to Pet'r Br. ("On several occasions, [my attorney] informed and assured me that I could not be convicted of the crimes alleged in my indictment, 'as question of law.' [¶] He said that . . . the government could not establish an essential element of the charge. [¶] That as a result I could not be convicted of the charges.").)

As a crucial part of the strategy to feature this jurisdictional defense, Fisher's attorney "insisted to [Fisher] . . . that if he testified on his own behalf this would severely prejudice [the jurisdictional] defense by making credibility an issue." (Cintolo Aff. ¶ 8.) Accordingly, even though Fisher repeatedly expressed, both before and during trial, his desire to testify in order to explain that he never intended to commit a murder-for-hire (*Id.* ¶¶ 5–6; Fisher Aff. 4), defense counsel "strongly advised [Fisher] to waive his right to testify." (Cintolo Aff. ¶ 9.) Ultimately, persuaded by his attorney, Fisher decided not to testify in his own defense.

At the close of the government's case, Fisher's attorney submitted a Rule 29 motion for judgment of acquittal. Fisher's attorney renewed that motion after he rested his case, and requested that he be able to submit it in writing at a later date. The Court granted that request. (Day 5 Trial Tr. 34–35.) A discussion of the briefing of the motion is provided below.

After both parties finished closing arguments, the jury received instructions from the Court. (Day 5 Trial Tr. 81–108.) The Court instructed the jury, without any objection from Fisher's counsel, "that intrastate use of a telephone or cellular phone was all that" 18 U.S.C. § 1958 required. *Fisher*, 494 F.3d at 10. On December 6, 2004, the jury returned a verdict of guilty on both counts. *Fisher*, 494 F.3d at 8.

## D. Fisher's Rule 29 Motion

On March 3, 2005, Fisher's attorney submitted a memorandum in support of Fisher's Rule 29 motion for acquittal, arguing, *inter alia*, that the government failed to "to produce sufficient evidence at trial to establish the jurisdictional element of 18 U.S.C. § 1958(a)—that the defendant used a facility 'in interstate commerce.'" (Rule 29 Mot. 7, Doc. No. 85.) In support of his argument that intrastate phone calls were an insufficient basis for a conviction, Fisher's attorney relied almost exclusively on the language and reasoning from an Eleventh Circuit case, *United States v. Drury*, 344 F.3d 1089 (11th Cir.2003). (*See* Rule 29 Mot. 7–14.) Defense counsel failed, however, to acknowledge, let alone discuss, that *Drury* had been vacated pending rehearing *en banc* on February 3, 2004, prior to Fisher's trial, 358 F.3d 1280 (11th Cir.), and had been superseded by an *en banc* opinion on January 18, 2005, prior to the submission of the memorandum in support of the Rule 29 motion, 396 F.3d 1303 (11th

Cir.). On April 12, 2005, this Court denied Fisher's Rule 29 motion.

## E. Fisher's Appeal

In May 2007, Fisher appealed his conviction to the United States Court of Appeals for the First Circuit. (Pet'r Br. 2.) Fisher, represented by counsel, appealed his conviction and sentence on the grounds that (1) "the government failed to show that the planned murder was in violation of a state or federal law, as required by the federal murder-for-hire statute,[5] ... [2] the government failed to meet its burden on the murder-for-hire charge, ... [3] trial errors require ... remand for a new trial, and ... [4] errors at sentencing require" vacation of his sentence. *Fisher*, 494 F.3d at 6. On July 13, 2007, the First Circuit rejected all of the Fisher's claims and affirmed his conviction and sentence. *Id.*

Of particular relevance to the instant petition, the First Circuit addressed Fisher's jurisdictional argument. The court viewed this ground of appeal as a claim of "instructional error because it is premised on a reading of the murder-for-hire statute that differs from the instruction given to the jury." *Id.* at 10. Because Fisher's counsel did not object to the jury instruction, the court examined the jury instruction for plain error. *Id.* The court admitted explicitly that it was an open question in the First Circuit as to "whether the version of § 1958(a) in effect at the time of Fisher's conviction requires the government to show interstate or cross-border activity, or whether intrastate usage of a means of communication such as a telephone will suffice." *Id.* at 10. The court did not, however, reach the issue. Instead, it held that even if the jury instruction was incorrect, i.e., 18 U.S.C. § 1958 did not criminalize intrastate communications, the error was harmless. *Id.* 10–11. Specifically, the court explained that the

---

**5.** Fisher was assisted by counsel only on this

ground. *Fisher,* 494 F.3d at 6.

evidence "strongly supported the reasonable inference that Ouimette lived in Canada and was in Canada when he spoke to Fisher, and that Fisher therefore made cross-border calls to contact him." *Id.* at 11. The court held that the evidence introduced at trial, viewed in the light most favorable to the prosecution, "was more than sufficient" to support a reasonable inference that Fisher had made a cross-border phone call with an intent to further a murder-for-hire. *Id.*

### F. Fisher's Section 2255 Petition

Fisher filed the instant petition on July 10, 2008. (Doc. No. 116 & 117.) After receiving two extensions of time, the government filed its opposition on November 10, 2008. (Doc. No. 123.) Fisher filed his reply on November 28, 2008. (Doc. No. 124.)

## III. ANALYSIS

### A. Standard of Review

■■■ Under section 2255, this Court is authorized to discharge or resentence a defendant if it concludes that the sentence "was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." [6] 28 U.S.C. § 2255 Under section 2255, the court shall grant an evidentiary hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." [7] *Mack v. United States*, 635 F.2d 20, 26 (1st Cir.1980) (quoting 28 U.S.C. § 2255). A petitioner bears the burden of demonstrating by a preponderance of the evidence that he is entitled to relief, including demonstrating entitlement to an evidentiary hearing. *United States v. DiCarlo*, 575 F.2d 952, 954 (1st Cir.1978). Generally, a hearing is not required when a section 2255 petition "(1) is inadequate on its face, or (2) although facially adequate, is conclusively refuted as to the alleged facts by the files and records of the case." *Moran v. Hogan*, 494 F.2d 1220, 1222 (1st Cir.1974).

■■ A petitioner's allegations are accepted "as true except to the extent they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *Porcaro v. United States*, 784 F.2d 38, 40 (1st Cir.1986). Additionally, "[i]f it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge

---

**6.** Section 2255(a) provides in full that:

A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a).

**7.** Section 2255(b) provides in full that:

Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto. If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him as may appear appropriate.

28 U.S.C. § 2255(b).

must dismiss the motion." Rule 4(b), Rules Governing Section 2255 Proceedings.

## B. Ineffective Assistance of Counsel

■ Fisher's petition contends that he received ineffective assistance of counsel during the pre-trial and trial stages of his prosecution. The Sixth Amendment of the United States Constitution guarantees "in all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. It has been determined that the right to assistance of counsel is the right "to be assisted by an attorney ... who plays the role necessary to ensure that the trial is fair." *Strickland v. Washington,* 466 U.S. 668, 685, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "The Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results." *Id.* Thus, "[t]he right to counsel is the right to the effective assistance of counsel." *McMann v. Richardson,* 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970).

To assert a claim of ineffective assistance of counsel, the petitioner must demonstrate that his attorney: (1) rendered performance that fell below an objective standard of reasonableness, and (2) that as a result of his attorney's unreasonable performance, he suffered actual prejudice. *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. An attorney's performance is judged by a standard of "reasonableness under prevailing professional norms." *Id.* at 688, 104 S.Ct. 2052. Generally, "[c]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690, 104 S.Ct. 2052. Put somewhat differently, "the defendant must overcome the presumption that, under the circumstances, the chal-

lenged action might 'might be considered sound trial strategy.'" *Id.* at 689, 104 S.Ct. 2052 (quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). Considering the totality of the circumstances, an attorney's conduct must be evaluated from his perspective at the time. *Id.* The court's review of counsel's performance must also be "highly deferential." *Id.*

A petitioner must also demonstrate that he has suffered actual prejudice as a result of his attorney's deficient performance, by showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

■ "[B]oth the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact." *Dugas v. Coplan,* 428 F.3d 317, 327 (1st Cir.2005) (quoting *Strickland,* 466 U.S. at 698, 104 S.Ct. 2052) (internal quotation marks omitted). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which ... will often be so, that course should be followed." *United States v. De La Cruz,* 514 F.3d 121, 140 (1st Cir.2008) (quoting *Strickland,* 466 U.S. at 697, 104 S.Ct. 2052) (internal quotation marks omitted). Ultimately, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland,* 466 U.S. at 686, 104 S.Ct. 2052.

### 1. Fisher's Ineffective Assistance of Counsel Claims Are Not Procedurally Barred.

■ The government asserts that Fisher's petition should be dismissed be-

cause the issues it raises have been or could have been brought on direct appeal. It has long been held that a "collateral challenge may not do service for an appeal." *United States v. Frady*, 456 U.S. 152, 165, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). An equally entrenched doctrine holds, however, that "an ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under section 2255, whether or not the petitioner could have raised the claim on direct appeal." *Massaro v. United States*, 538 U.S. 500, 504, 123 S.Ct. 1690, 155 L.Ed.2d 714 (2003). Thus, contrary to the government's argument, Fisher's ineffective assistance of counsel claims are not procedurally defaulted. Further, the crucial factual allegations in Fisher's petition relate to the advice he received from his counsel about the strength of his jurisdictional defense. Because such privileged conversations are not held on the record, and thus could not be examined by the First Circuit on direct appeal, a section 2255 petition, in which a court can consider off-the-record allegation, presents the proper mechanism for raising such claims.

## 2. Fisher Did Not Receive Ineffective Assistance of Counsel.

Fisher puts forward two claims of ineffective assistance of counsel that both emanate from the advice he received from his attorney regarding the strength of his jurisdictional defense. First, he asserts that his attorney, relying on objectively unreasonable legal research about the jurisdictional scope of 18 U.S.C. § 1958, provided ineffective assistance of counsel by strongly advising Fisher to waive his fundamental constitutional right to testify at trial. Second, Fisher contends that his attorney's inaccurate advice about the strength of the jurisdictional defense caused Fisher to plead not guilty, proceed to trial, and forego a possible reduction in sentence for

sparing the government the burden and expense of trial.

### a. The Right to Testify

"It is clear that a defendant has a 'fundamental constitutional' right to testify in his own defense, and that the right must be 'unfettered.'" *Owens v. United States*, 483 F.3d 48, 58 (1st Cir. 2007) (quoting *Rock v. Arkansas*, 483 U.S. 44, 51–53, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987), and *Harris v. New York*, 401 U.S. 222, 230, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971)). Because "[a] lawyer plays the primary role in advising his client of the right to testify," *id.*, "an ineffective assistance of counsel claim is the appropriate vehicle for a criminal defendant to raise an alleged violation of his right to testify." *United States v. Van De Walker*, 141 F.3d 1451, 1452 (11th Cir.1998). To prevail on such a claim, a defendant must satisfy *Strickland*'s familiar performance and prejudice analysis. *See Owens*, 483 F.3d at 57–58.

"Unaccompanied by coercion, legal advice concerning exercise of the right to testify infringes no right, but simply discharges defense counsel's ethical responsibility to the accused." *Lema v. United States*, 987 F.2d 48, 52 (1st Cir. 1993) (citation omitted). In the context of the right to testify, the First Circuit has interpreted the term "coercion" as having at least three potential meanings. First, defendants may be coerced into unknowingly and involuntarily waiving their right to testify if their attorney entirely fails to inform their client that they have a right to testify. *See id.* (holding that one consideration regarding whether a defendant has been coerced is "[w]hether the defendant knew about his constitutional right to testify, and if not, whether he was informed by counsel"). Second, defendants may be deprived of their fundamental right to testify if "the [in]competence and

[un] soundness of defense counsel's tactical advice" regarding whether they should testify, leaves defendants "with[out] sufficient information to permit a 'meaningful' voluntary waiver of the right to testify." *Id.* at 53. Finally, coercion may occur where "intimidation or threatened retaliation by counsel relating to the defendant's testimonial decision" causes a defendant not to testify. *Id.*

Fisher's petition fits squarely into the second category. He alleges that his attorney strongly advised him not to testify because of concerns that putting Fisher on the stand would distract from, if not undermine entirely, Fisher's jurisdictional defense. Fisher claims, however, that when his attorney advised him not to testify, his attorney held a fundamentally erroneous understanding of the state of the law regarding whether 18 U.S.C. § 1958 brought intrastate phone calls within its ambit. Because of this misunderstanding, Fisher contends that the advice he received regarding whether to testify was inaccurate and overly optimistic such that he could not intentionally and knowingly waive his right to testify at trial. Put differently, Fisher claims that he chose not to testify because of his attorney's optimism about Fisher's chances of beating the murder-for-hire count by means of the jurisdictional defense; and that his attorney's confidence in the defense was the product of objectively unreasonable legal research.

Fisher asserts that his attorney's optimism about the jurisdictional defense was incorrect in two respects. First, Fisher claims that at the time of his trial and conviction, it was settled law within the First Circuit that evidence of intrastate phone calls made in furtherance of an murder-for-hire were sufficient for a conviction under 18 U.S.C. § 1958. Second, he claims that his attorney's confidence that intrastate phone calls could not satisfy the jurisdictional element of 18 U.S.C. § 1958 was founded primarily, if not exclusively, on an Eleventh Circuit case that had been vacated and overturned by the time of Fisher's trial and conviction. He contends that individually or collectively, these shortcomings demonstrate that his attorney's performance fell below an objective standard of reasonableness.

Fisher's first allegation of ineffectiveness can be easily dismissed. The opinion in Fisher's own appeal clearly indicates that at the time of his trial and conviction, it was an open question within the First Circuit as to whether evidence of intrastate phone calls was sufficient to obtain a conviction under 18 U.S.C. § 1958. On appeal, Fisher asserted "that the evidence [was] not sufficient to sustain his conviction on the murder-for-hire count because the government failed to prove the jurisdictional element of 18 U.S.C. § 1958." *Fisher*, 494 F.3d at 9. In addressing this claim, the First Circuit explicitly stated that "[a]s to the legal question, this circuit has not previously determined whether the version of § 1958(a) in effect at the time of Fisher's conviction requires the government to show interstate or cross-border activity, or whether intrastate usage of a means of communication such as a telephone will suffice." *Id.* at 10. Given this proclamation, Fisher's attorney was clearly correct that in the First Circuit at the time of Fisher's trial and conviction, the jurisdictional scope of 18 U.S.C. § 1958 was not a settled issue. Thus, Fisher's attorney's performance was not deficient, at least to the extent Fisher alleges his attorney held an unreasonable view of relevant First Circuit case law.

That Fisher's attorney's jurisdictional defense was viable in the First Circuit does not, however, necessarily make his attorney's performance reasonable. According to Fisher's and his attorney's affi-

davits, Fisher's attorney conveyed to Fisher that the jurisdictional defense was remarkably strong, almost unassailable. Fisher's attorney told Fisher that "he was innocent of the" murder-for-hire count, that "an element of the offense was lacking," and that he "was confident that [the jurisdictional] defense would result in [Fisher's] acquittal of the charges after trial." (Cintolo Aff. ¶¶ 6–7.) Fisher understood these statements to mean that he "could not be convicted of the crimes alleged in [his] indictment." (Fisher Aff. ¶ 5; *see also id.* ¶¶ 6–7 ("[My attorney said that 'as a question of law' the government could not establish an essential element of the charge. [¶] That as a result I could not be convicted of the charges.").) Fisher's attorney also conveyed to Fisher that "if [Fisher] testified on his own behalf this would *severely* prejudice" the jurisdictional defense. (Cintolo Aff. ¶ 8 (emphasis added).) Fisher interpreted his attorney's caution to mean that "if [he] insisted on testifying, his [jurisdictional defense] would be badly prejudiced, because [he] would put [his] credibility at issue...." (Fisher Aff. ¶ 8.) Further, Fisher believed that "if [he] testified, [he] would be convicted of the ..." murder for hire charge. (*Id.* ¶ 9.)

As it turns out, Fisher's attorney's basis for believing that the jurisdictional defense had a high likelihood of success (and thus his reason for advising Fisher not to testify), was grounded on a dubious reading of the out-of-circuit case law. In support of Fisher's Rule 29 motion, in which he argued that intrastate phone calls were an insufficient basis for a conviction, Fisher's attorney relied almost exclusively on the language and reasoning of an Eleventh Circuit opinion, *United States v. Drury*, 344 F.3d 1089 (11th Cir.2003). (*See* Rule 29 Mot. 7–14.) In that case, an Eleventh Circuit panel concluded that "18 U.S.C. § 1958(a)'s jurisdictional element requires that a defendant must actually use a facili-

ty in a manner that implicates interstate commerce, not just that the facility itself possess the capability of affecting interstate commerce." *Id.* at 1104. Fisher's attorney states that his "legal authority for [the jurisdiction defense] was the case of *U.S. v. Drury.* ..." (Cintolo Aff. ¶ 11.)

At the time of Fisher's trial and the submission of Fisher's Rule 29 motion, however, *Drury* was no longer good law. The Eleventh Circuit, sitting en banc, vacated the opinion pending rehearing on February 3, 2004, prior to Fisher's trial, 358 F.3d 1280 (11th Cir.), and issued a superseding opinion on January 18, 2005, prior to the submission of the memorandum in support of the Rule 29 motion, 396 F.3d 1303 (11th Cir.). In that superseding opinion, the Eleventh Circuit, much like the First Circuit in Fisher's own appeal, elected "not [to] decide whether § 1958(a) actually *requires* that a facility be used in interstate commerce, since it suffices here to observe that uncontroverted evidence establishes that the relevant facility (the telephone) was so used." *Id.* at 1312. Fisher's attorney did not acknowledge anywhere in the Rule 29 motion that the exact holding he relied upon in the *Drury* panel opinion had fallen in disrepute. Fisher's attorney also admits that "due to [his] overload of work at the time, [he] cannot be certain whether [he] Shepardized *U.S. v. Drury.*" (Cintolo Aff. ¶ 13.)

Fisher's attorney did cite at least two other cases—*United States v. Weathers*, 169 F.3d 336 (6th Cir.1999), and *United States v. Paredes*, 950 F.Supp. 584, 590 (S.D.N.Y.1996)—that, at the time, could be interpreted as supporting the position that 18 U.S.C. § 1958 did not reach purely intrastate phone calls. But he also ignored some relevant First Circuit authority that was indirectly hostile to his reading of the statute and a slew of out-of-circuit

cases holding that intrastate phone calls could violate 18 U.S.C. § 1958.

Whether Fisher's attorney's legal research and the advice that emanated from it fell below objective standards of reasonableness is a difficult and close issue. Although attorneys receive great deference regarding strategic decisions, this Court can conceive of no way to justify Fisher's attorney's near-exclusive reliance on a superseded case, without even acknowledging that the case had fallen into disrepute, as "sound trial strategy." Similarly, it is difficult to excuse Fisher's attorney's failure to provide Fisher with a more nuanced analysis of the jurisdictional defense's probability of success, particularly given the existing circuit split on the issue (with the weight of authority against Fisher's interpretation).

 The Court need not decide the issue, however, because even if this Court assumes that Fisher's attorney's performance fell below an objective standard of reasonableness, Fisher cannot demonstrate that he suffered any prejudice. To establish prejudice, Fisher must, but cannot, show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

Fisher asserts that but for his attorney's misunderstanding of the jurisdictional element of 18 U.S.C. § 1958 and his resultant overstatement of Fisher's chances of securing an acquittal on the murder-for-hire charge, Fisher would have exercised his right to testify in his own defense. Fisher's affidavit does not contain any talismanic statement to the effect of "if my attorney had provided me with a more realistic picture of the jurisdictional defense's probability of success, I would have testified at trial." Still, Fisher's and his attorney's affidavits strongly support the inference that (1) Fisher repeatedly expressed a strong interest in testifying at trial (*see* Fisher Aff. ¶ 3 ("[O]n several occasions prior to my trial . . ., I informed Mr. Cintolo that I wished to testify in my own defense at trial."); Cintolo Aff. ¶ 4 ("On several occasions [Fisher] insisted to me that he wanted to testify on his own defense.")), and (2) but for his attorney's advice that Fisher could only harm the jurisdictional defense by testifying, Fisher would have elected to testify. (Cintolo Aff. ¶ 14 ("[I]n reliance on my assurances to him of my 'question of law' defense and the potential prejudice of his testimony to such defense, I convinced Casey Fisher to waive his right to testify and not proceed with a lack of intent defense.").) This Court holds that, on its face, Fisher's petition demonstrates a reasonable probability that with more accurate information about the jurisdictional defense, he would have testified.

Demonstrating that he would have testified is only half the battle. Fisher must also show that his hypothetical testimony would have so altered the trajectory of his trial such that this Court can no longer be confident in the trial's outcome. Here, the lack of specificity in Fisher's affidavit regarding the proposed substance of his testimony, as well as the mountain of evidence submitted by the government, proves fatal to his claim. In his affidavit, Fisher states that he "would have challenged the government's evidence that [he] intended to commit the crimes alleged in [the] indictment." (Fisher Aff. ¶ 4.) His attorney explains that "[Fisher] told me that [through his testimony] he wanted to show the jury that he never had the intent of committing the crimes, alleged, in his indictment." (Cintolo Aff. ¶ 5.) In Fisher's memorandum to support his petition, he provides a bit more detail about the potential substance of his testimony. Fisher claims essentially that he would have testified that he never contacted Grassia be-

cause he "never intended to arrive at an agreement between himself and [Grassia] nor to solicit him to do a murder for hire." (Pet'r Br. 12.) Further, he would have explained that at worst, he intended to tamper with Brousseau as a witness, and "convince" him not to testify. (*Id.*)

The Court holds that none of Fisher's proposed testimony undermines confidence in the outcome of his trial such that an evidentiary hearing would be necessary. The government introduced evidence, both circumstantial and direct, of at least four phone calls that the fact-finder reasonably could have determined were made with the intent that a murder-for-hire be committed.

—A phone call or phone calls from Fisher to Norman Ouimette's home and cell phone in Canada made sometime between August 28 and August 31, 2003, to find out Brousseau's name. Otero and Aucoin testified that Fisher sought Brousseau's name so that he could identify the individual who would testify against his brother, John Fisher. The government also submitted into evidence a piece of paper with Brousseau's name that Fisher gave to Aucoin when Fisher requested that Aucoin murder Brousseau.

—A phone call or phone calls from Fisher to Aucoin to set up a meeting sometime between August 28 and August 31, 2003. Aucoin testified that at this meeting, Fisher asked Aucoin to murder Brousseau.

—A phone call or phone calls from Fisher to Aucoin to set up another meeting on September 10, 2003, at which the two could discuss whether Aucoin would murder Brousseau.

—A phone call or phone calls from Fisher to Aucoin made on September 19, 2003, to set up the meeting with Aucoin and Grassia, the undercover agent posing as a hit man. At the meeting, Fisher and Grassia discussed, at length, that Fisher would have to pay Grassia $5,000 up front, and $5,000 after Brousseau was murdered.

None of Fisher's proposed testimony undermines the Court's confidence that Fisher had the intent to murder Brousseau when he made at least one of these telephone calls. Given the overwhelming evidence that all four calls were made with the intent to further the murder of Brousseau, Fisher's testimony that he did not intend to murder Brousseau would be inherently incredible. Over a period of at least three weeks from August 28, 2003, until September 19, 2003, Fisher made repeated inquiries of multiple individuals, including Otero, Aucoin, and Grassia, regarding how he could "get rid" of Brousseau. He also expressed on a number of occasions that he was willing to pay someone to murder Brousseau. Thus, even if this Court assumes Fisher's attorney performed deficiently, Fisher suffered no prejudice.[8] Accordingly, this Court must deny Fisher's section 2255 petition to the extent it asserts that the ineffective assistance of his counsel resulted in the violation of his right to testify.

### b. Ineffective Assistance Regarding Advice to Plead Not Guilty and Proceed to Trial

 Fisher also claims that but for his attorney's misinforming him about the jurisdictional defense's chances of success, he would have pled guilty to all charges and been eligible for a three-level reduction in sentencing. (Pet'r Br. 12–13.) Here again, Fisher has failed to demonstrate that he suffered any prejudice. Al-

---

**8.** This analysis does not even take into account the inherent risk involved if Fisher testified. Once Fisher exercised his right to testify, the government would have been permitted to impeach Fisher's credibility.

though he correctly states that he might have received a lighter sentence had he pled guilty instead of proceeding to trial, nowhere in his affidavit or his petition does he state that, but for his attorney's deficient performance, he would have pled guilty. Without such a statement, this Court cannot conclude that Fisher suffered any prejudice. Thus, the Court denies this component of Fisher's section 2255 petition.

## IV. CONCLUSION

For the reasons set forth above, the Court dismisses Fisher's section 2255 petition.

SO ORDERED.